Visalakshi **MALLADI**, Plaintiff,

v.

Jesse **BROWN**, in his official capacity as Secretary of Veterans Affairs, Defendant.

No. Civ. A. 96–T–431–E.

United States District Court, M.D. Alabama, Eastern Division.

Dec. 1, 1997.

896

900

Alvin T. Prestwood, Volz, Prestwood, Hanan & Sizemore, Montgomery, AL, for Plaintiff.

Patricia A. Snyder, Redding Pitt, U.S. Atty., Leura J. Garrett, U.S. Atty's Office, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Visalakshi Malladi, who is of "Asian origin from the Indian Sub–Continent,"[1] brings this lawsuit charging defendant Secretary of Veterans Affairs (hereinafter referred to as the "VA") with discriminating against her because of her race, sex, and national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and because of her handicap, in violation of the Rehabilitation Act, 29 U.S.C.A. §§ 791 and 794, and with retaliating against her for engaging in protected activity, in violation of Title VII. Malladi is also seeking review of her grievances under the Administrative Procedures Act (hereinafter referred to as the "APA"), 5 U.S.C.A. §§ 702 and 706. Jurisdiction arises under 42 U.S.C.A. § 2000e–5 (Title VII), 29 U.S.C.A. § 794 (Rehabilitation Act), 5 U.S.C.A. § 702 (APA), and 28 U.S.C.A.

§ 1331 (general federal question) and § 1343 (civil rights). This lawsuit is now before the court on the VA Secretary's motion for summary judgment, filed June 18, 1997. For the reasons that follow, the Secretary's motion will be granted.

However, before turning to the motion, the court is compelled to offer to the bench and bar some special introductory comments about this case. As will be evident from this lengthy memorandum opinion, this lawsuit presents a picture (which is becoming more and more frequent) of an abuse of the law and the judicial process. First, Malladi's case is an abuse of the court. Malladi has submitted to the court scores of claims (as contained in administrative charges and subcharges) under almost every theory she and her attorneys could uncover or imagine under statutory and case law. Surely, Malladi and her attorneys know that she has not been the victim of race, sex, national origin, and handicap discrimination simultaneously for almost every adverse employment decision at the VA. This all-encompassing contention defies common sense. It is apparent that what she and her attorneys have done is to take a kitchen sink approach—that is, to put before the court all conceivable claims, with the hope that the court would sort and sift through them in search of a colorable one. This trial strategy is grossly unfair to the court and all other litigants who come before it. For, the inordinate amount of time the court has had to spend sorting through Malladi's claims has been time unavailable to analyzing other claims and fashioning relief for other individuals, many of whom may truly have been the victims of serious wrongs. Malladi's attorneys, not the court, have the responsibility of weeding out frivolous and questionable claims. Her attorneys should have presented to the court only those claims which they believe presented colorable allegations of wrongdoings. They, not the court, should sift through her allegations and determine whether she has been the victim of discrimination and, if so, of what type and for what acts.

1. Plaintiff's complaint, filed March 8, 1996, ¶ 3.

The court understands that a person can be a victim of pervasive and multiple types of discrimination. But this understanding has reasonable limits and is not an invitation to abuse. Lawyers have an obligation, just as much as judges, to make sure that these limits are respected. When lawyers fail to meet this obligation they fail to live up to the oath they took as officers of the court. Indeed, courts cannot function as delivers of justice—they cannot give all cases the fair and careful and expeditious consideration each one deserves—when they are burdened with cases such as this one.

Second, Malladi's case is an abuse of the opposing litigant. Malladi and her attorneys have essentially forced the VA Secretary to waste his limited taxpayer-funded resources in the defense of frivolous and marginal claims. Indeed, some of her claims are so lacking in merit that the court must conclude she has, and is, pursuing these out of vindictiveness—that is, she has used, and is using, the legal process as a sword of revenge and harassment. With her almost reflexive filing of boiler-plate administrative charges to any adverse employment action taken against her, she has essentially distorted her work environment into one in which the VA has had to devote itself to responding to her claims, rather than to tie real issues of whether she is, in fact, doing a good job and whether she and all other employees are providing services patients need.

Ironically, Malladi's kitchen-sink approach is, in the end, self-defeating. By lumping her frivolous claims with her arguably colorable claims, both she and her lawyers risk losing all credibility with the court. By challenging almost all actions adverse to her under almost every conceivable applicable law, she risks making her entire case seem frivolous. With such a strategy, she risks appearing before the court as a petty and pesky litigator, rather than as a real victim of discrimination who warrants careful and sympathetic consideration.

Finally and most importantly, cases such as Malladi's constitute an abuse of the very laws they seek to invoke. The purpose of laws banning discrimination based on race, sex, nation origin, and disability is venerable: to eliminate and redress serious acts of discrimination suffered by employees, both public and private. They were not intended, as Malladi has used them here, to be a generalized grievance process for disgruntled employees. What Malladi does here is essentially to mock the laws. In a sense, therefore, it is Malladi, and not the VA, who is guilty of a gross injustice in violation of these laws.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

The court finds the relevant and salient background facts to be as follows:

*February 1988:* Malladi was hired as a staff physiatrist—a physician who specializes in physical medicine, that is, the treatment of illness by way of physical means—by the VA in the Physical Medicine and Rehabilitation Service (PM & RS) at the Veterans Administration Medical Center in Tuskegee, Alabama (TVAMC). Stanley B. Kahane became the chief of staff of TVAMC at approximately the same time.

*September 1988:* Malladi was designated as acting chief of PM & RS.

*March 1989:* Malladi was appointed chief of PM & RS.

*December 24, 1992 to January 11, 1995:* Malladi filed seven separate Equal Employment Opportunity administrative charges, commonly referred to as EEO charges, alleging that the VA discriminated against her because of her race, sex, national origin, and handicap, and that the VA retaliated against her for engaging in protected activity.

*March 30, 1995:* The parties settled Malladi's seven pending administrative charges by way of a global settlement agreement.

*June 29, 1995:* Malladi wrote a letter requesting that the Equal Employment Opportunity Office at the VA reopen the charges underlying the settlement agreement because, she alleged, multiple provisions of the settlement agreement had been breached by the VA.

*August 25, 1995:* Malladi filed her eighth EEO charge alleging retaliation based on the following: (1) her May 1995 request to hire a staff physiatrist was denied; (2) Kahane's administrative assistant telephoned her while she was on sick leave at her home to see if she could return to work; and (3) Kahane denied her request to cancel the outpatient rehabilitation clinic and electromyography test.

*Fall 1995:* The TVAMC management requested a site visit team to conduct a thorough review of PM & RS because of problems it saw in the service resulting from Malladi's refusal to accept decisions of management, failure to cooperate with management, bad relations with subordinate employees, and disputes about workload.

*October 23, 1995:* The VA issued its ruling on Malladi's request to reopen her underlying claims because of the breach of the settlement agreement, concluding that it had not breached the settlement agreement.

*October 30, 1995:* Malladi filed her ninth EEO charge alleging retaliation based on the denial of her August 1995 request to hire a staff physiatrist.

*November 13, 1995:* Malladi appealed the VA's ruling that it had not breached the settlement agreement to the Equal Employment Opportunity Commission (hereinafter referred to as the "EEOC").

*December 14 and 15, 1995:* The site visit team conducted a two-day review of PM & RS.

*January 2, 1996:* Malladi filed her tenth EEO charge alleging (1) breach of the settlement agreement, and (2) retaliation based on improper treatment by Kahane in that he allegedly shouted at her in front of her subordinates.

*January 16, 1996:* The site visit team issued its report. The report detailed many problems with PM & RS, including very low employee morale, substantial infighting among employees, minimal evidence of quality improvement initiatives, poor use of the coordinator position, no communication within the service or with the administration, irreconcilable differences between Malladi and the staff, no evidence of workload validation, no process for downsizing, no prioritization of patients to be seen, and no strategic plan. In addition, the report indicated that Malladi's claims of overwork were unsubstantiated, and there were no data to support Malladi's continual requests for an additional physiatrist. The report also included the following finding:

"In discussion with the Chief of Staff, Medical Center Director and the Associate Director, a strong concern was expressed regarding the inability of the Medical Center leadership to gain cooperation with the current Chief of PM & RS in resolving issues precipitating the site visit. This concern stems from the recent history of EEO complaints filed by the Chief, PM & RS. Since December of 1992, the Chief, PM & RS has registered a total of 12 EEO complaints against the Director, Chief of Staff, and Associate Director (triad) alleging discrimination on the basis of race, disability and gender. In review of EEO records, the majority of filings stem from the Chief's perceived feeling of discrimination relating to a refusal by triad to provide additional physician staffing to PM & RS. Seven of the complaints have been

resolved via a global settlement agreement signed March 30, 1995. The Chief had continued to register complaints to the EEO commission based on perceived reprisal from the triad in relation to her original complaint. As a result of the continued filing, the members of the triad feel incapacitated in providing the Chief with adequate direction and assistance in management of her service. In discussion with Dr. Torrado, the Staff Assistant for EEO, this continued filing has also burdened the EEO system at the hospital and resulted in excessive provision of resources by the EEO staff to continually review Dr. Malladi's complaints." [2]

On the basis of the information it collected, the site visit team recommended, among other things, that Malladi be removed from her position as chief of PM & RS, and reassigned to another position in the hospital outside of PM & RS.[3]

*January 19, 1996:* Malladi received a memorandum from Jimmie L. Clay, the medical center director, informing her that she was being detailed to Ambulatory Care Service for a period not to exceed 30 days.

*January 22, 1996:* Malladi filed her eleventh EEO charge alleging retaliation and discrimination because of her race, sex, national origin, and handicap based on statements made by her subordinate employees to the EEO counselor conducting the investigation of her ninth EEO charge.

*February 6, 1996:* Kahane recommended to Clay that Malladi be permanently reassigned from her position as chief of PM & RS to a staff physician position in Ambulatory Care Service because he felt: (1) Malladi's leadership was inadequate and had caused a rift within the service; (2) Malladi's inadequate supervision of physician extender staff may jeopardize patients; (3) there was substantial infighting among the PM & RS staff; and (4) Malladi failed to work cooperatively with the TVAMC management. This recommendation relied explicitly on the findings and recommendations of the site visit team. Clay informed Malladi of her permanent reassignment, to be effective February 18, 1996.

*February 14, 1996:* Malladi filed her twelfth EEO charge alleging retaliation and discrimination because of her race, sex, national origin, and handicap based on the following: (1) Kahane treated her inappropriately relative to her management of subordinate employees in two incidents in her service involving patient abuse and financial dealing with a patient; (2) Clay made unreasonable delays in responding to her written request for an EEO counselor's report; (3) there was an inappropriate referral of her EEO charge to the VA central office for procedural review; and (4) there was an unfair and inappropriate request for a site visit.

*February 15, 1996:* Kahane gave Malladi a proposed letter of admonishment for her actions in the management of subordinate employees in two incidents in her service involving patient abuse and financial dealings with a patient.

*March 4, 1996:* Clay gave Malladi a letter of admonishment based on the proposed admonishment dated February 15, 1996.

*March 8, 1996:* This lawsuit was filed.

*March 12, 1996:* Pursuant to the VA's internal grievance procedures, Malladi filed formal grievances with respect to her permanent reassignment to the ambulatory care service and her letter of admonishment for her handling of patient/employee matters.

*March 28, 1996:* Malladi filed her thirteenth EEO charge alleging retaliation and discrimination because of her race, sex, national origin, and handicap based on the following: (1) on January 19, 1996, she was detailed out of PM & RS to Ambulatory Care Service; (2) the PM & RS staff was informed that she had been detailed to another service and removed as chief of PM & RS before she was notified; (3) the site visit team's report was biased and unfair and targeted her as chief of PM & RS and as a physiatrist; (4) her reassignment to a staff physician in Ambulatory Care Service reduced her pay by $8,250, which represented the special pay for

---

**2.** Defendant's exhibit D, attachment 6, at 3.

**3.** *Id.* at 5–6.

being service chief and not a reduction in base pay; (5) Kahane authorized her former subordinate staff physiatrist, who is board eligible, to countersign her consultations, while she is board certified; (6) Clay inappropriately referred her EEO charges to the VA central office for procedural review; (7) Kahane caused the keys to the chief of PM & RS office and government scooter to be taken from her on the same day as her detail; and (8) Kahane gave her a proposed memorandum of admonishment and the subsequent memorandum of admonishment.

*April 17, 1996:* Pursuant to the VA's internal grievance procedures, Malladi filed a formal grievance with respect to the VA's failure to follow rules in giving her an "unsatisfactory" rating on March 13, 1996.

*May 1, 1996:* Larry R. Deal, the director of the Atlanta Network of VA facilities, sent Malladi a letter informing her that her April 17, 1996, grievance was excluded from processing because "[o]ur VA Manual MP–5, Part II, Chapter 8, Section B, paragraph 14(h) specifically excludes complaints arising from dissatisfaction with the proficiency rating from coverage under the grievance procedure." He indicated that although Malladi made a specific point of taking issue with the "procedure used in the proficiency evaluation, . . . it is clear that your complaint goes to the proficiency rating itself and is therefore excluded from coverage."

*May 14, 1996:* Shirley Cooper, the grievance examiner appointed by the VA, issued her report of findings and recommendations regarding Malladi's grievances with respect to her permanent reassignment to the ambulatory care service and her letter of admonishment for her handling of patient/employee matters. Cooper concluded that there was ample evidence to support both actions by TVAMC and that Malladi's grievances were without merit.

*October 10, 1996:* Malladi's complaint was amended to include the allegations in her thirteenth EEO charge.

*December 18, 1996:* The EEOC issued its ruling on Malladi's request to reopen her

underlying claims because of the breach of the settlement agreement,[4] concluding that the VA had breached ¶ 2.d of the settlement agreement with respect to providing Malladi with management training. As a remedy, the EEOC did not order that Malladi's underlying complaints be reopened, but that the VA should comply with ¶ 2.d. The EEOC also concluded that it needed more evidence to determine if the VA had breached ¶ 2.e with respect to providing good faith consideration for Malladi to serve as acting chief of staff in the chief of staff's absence. The EEOC ordered that more evidence be provided with respect to ¶ 2.e, and has not entered another ruling.

### III. DISCUSSION

Malladi asserts many and varied claims of discrimination in this case, in addition to seeking review of her grievances under the APA. She alleges claims of disparate treatment because of her race, sex, handicap, and national origin, and retaliation for engaging in protected activity, all of which are based on thirteen separate EEO charges with multiple factual bases. The court's discussion of the issues begins with consideration of whether there was a breach of the global settlement agreement into which the parties entered on March 30, 1995, which governs the claims made in Malladi's first seven EEO charges, and then continues on to a discussion of her remaining EEO charges, and the review of her grievances under the APA.

#### A. Breach of the Settlement Agreement

■ Malladi alleges that her first seven EEO charges, which were settled by way of a global settlement agreement entered into by the parties on March 30, 1995,[5] should be reopened and litigated because the VA breached the agreement. She bases her argument on ¶ 4 of the agreement, which states, in relevant part, that the "VA agrees that, should it fail to comply with any of the terms set forth herein for reasons not attributable to acts or conduct of the complainant, it will reopen the complaint for further processing at the point in the process where

---

4. Defendant's exhibit W.

5. Defendant's exhibit U.

processing ceased as a result of this agreement." Malladi alleges that the VA breached the settlement agreement by: (1) not providing her with management training in accordance with ¶ 2.d; [6] (2) not providing her with the opportunity to serve as chief of staff in accordance with ¶ 2.e; [7] (3) failing to pay her attorney fees in a timely fashion in accordance with ¶ 2.g; [8] (4) failing to provide a non-discriminatory environment in accordance with ¶ 2.h; [9] and (5) not sending her a confirmation letter of the removal of her "appraisal of applicant" form in accordance with ¶ 2.i.[10]

Settlement of EEO charges by a settlement agreement results in a contract between the plaintiff and the defendant. This contract is thus enforced according to the rules of contract law. For there to be a breach of the settlement agreement that is sufficient to discharge a party from her obligations under the contract, and that would allow her to open up the underlying claims for further adjudication, the breach must be "material." *See Ferrell v. Secretary of Defense,* 662 F.2d 1179, 1181 (5th Cir.1981). "According to the original Restatement of Contracts, if the failure of one party to perform part of a contract is so material that it results in the other party not receiving substantially what he bargained for, the duty of the injured party is discharged and [she] is, thereby, wholly excused from carrying out [her] undertaking. *See* Restatement of Contracts § 274, 397 (1932). If, on the other hand, the failure to perform is not material, the injured party retains [her] duty to render

[her] performance. *See id.* § 274i(1). There is still a breach of contract, but the innocent party must recoup [her] losses, if any, for such an immaterial breach through an action for damages or one of the other procedural devices designed for that purpose." *Ferrell,* 662 F.2d at 1181.

A non-material breach, although possibly causing some damage to the plaintiff, is not sufficient to discharge Malladi from her obligations. Not every breach of a contract amounts to a material breach. A material breach occurs only when an injured party has sustained a substantial injury by the breach. The Restatement (Second) of Contracts § 241 (1979) suggests five criteria to consider in assessing whether a breach of contract is material. The criteria involve considering: (1) the extent to which the injured party will be deprived of the benefit which she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which she will be deprived; (3) the extent to which the breaching party will suffer forfeiture; (4) the likelihood that the breaching party will cure; and (5) the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing.[11]

The breaches that Malladi alleges of ¶ 2.g, with respect to paying her attorney fees, and ¶ 2.i, with respect to removing the "appraisal of applicant" from her application file, do not amount to breaches of the agreement at all

---

6. Paragraph 2.d of the settlement agreement provides that the VA shall, "[i]n good faith, provide Complainant with an opportunity for management training."

7. Paragraph 2.e of the settlement agreement provides that the VA will "[i]nsure that Complainant receives due consideration for any opportunity to fulfill the Acting Chief of Staff's position at Tuskegee VAMC should the need for that position arise;"

8. Paragraph 2.g of the settlement agreement provides that the VA will "[p]ay Complainant's attorney fees in the amount of $9,000.00."

9. Paragraph 2.h of the settlement agreement provides that the VA shall "[p]rovide the Complainant with a fair and equitable work environment

free from harassment or any other discrimination based on race, color, religion, sex, national origin, age, handicapping condition or reprisal for filing these complaints."

10. Paragraph 2.i of the settlement agreement provides that the VA will "[r]emove the 'appraisal of applicant' dated 11–21–92 from the selection file for the Chief of Staff position at Lake City, Florida, VAMC."

11. "[A] breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow [her] to recover damages based on all [her] remaining rights to performance." Restatement (Second) of Contracts § 243(4) (1979).

because the VA has performed its obligations under both provisions. The evidence with respect to ¶ 2.i is undisputed that the "appraisal of applicant" was removed from Malladi's file.[12] Malladi contends that the VA did not send her a confirmation letter to let her know that this had happened. First, sending Malladi a confirmation letter was not a requirement according to the terms of the agreement, and thus not sending one is not a breach of the agreement. Even if sending a confirmation letter was a requirement, it is seriously doubtful that not sending one would amount to a material breach because Malladi would still have received essentially what she bargained for. With respect to ¶ 2.g, the evidence is also undisputed that the VA has paid her attorney fees as required by the agreement.[13] There was a seven-month delay in the payment of the money, but it was paid. If any remedy is appropriate for this delay, it is a claim for any monetary damage Malladi may have suffered, but not a release from her obligations under the agreement.

The breach that Malladi alleges of ¶ 2.e, with respect to considering her for the opportunity to serve as acting chief of staff, also does not amount to a material breach of the contract. The uncontradicted evidence indicates that since the date of the settlement agreement, there has been no occasion on which there was a need for an acting chief of staff that required the consideration of service chiefs like Malladi.[14] There was a number of instances in which there was an acting chief of staff after the parties entered into the settlement agreement, but they were all filled by the two deputy chiefs of staff, which appears to be the normal procedure followed by the VA.[15] Only in the absence of the deputies did the VA consider the service chiefs to fill in. Thus, there is no indication that the VA did not do what it agreed to do, which was give Malladi good faith consider-

ation should the need arise for an acting chief of staff. Therefore, there does not appear to have been any breach of ¶ 2.e, much less a material breach.

The breach that Malladi alleges of ¶ 2.d, with respect to the VA providing her with the opportunity for management training, also does not amount to a material breach. The evidence is clear that Malladi has not attended any management training.[16] She was presented with information about two different management·training sessions, but this information was provided as part of the normal circulation of information the VA makes to all its service chiefs;[17] no special effort was made to give special notice to Malladi. This may well constitute a breach of the agreement, but it definitely does not warrant the penalties that go along with a finding of a material breach; this breach can be easily cured by compelling the VA to fulfill its obligation. In its ruling, the EEOC determined that there had been a breach of the agreement with respect to this paragraph, and ordered that the VA comply with its obligation. The court agrees with this finding and order by the EEOC and finds that a breach of this sort does not amount to a material breach calling for a release of Malladi from her obligations. Malladi may well be entitled to damages for any harm caused her by the failure to provide management training, or to an order for specific performance, but that is best pursued in a separate suit based on the contract.

With respect to all the foregoing allegations, Malladi is not without relief. She can always bring a separate suit for enforcement of the contract or for damages for any breach. This is the appropriate procedure for redressing a breach of a contract, which is what Malladi has created with the VA by entering into a settlement agreement.

12. Defendant's exhibit D, ¶ 7.

13. Plaintiff's exhibit B, at 519.

14. Malladi alleges that a Dr. Warren, who is one of the other service chiefs, served as the acting chief of staff, and that she was not considered at that time. Plaintiff's exhibit B, at 522–24. The evidence indicates, however, that his service occurred before the parties entered into the global

settlement agreement requiring Malladi's consideration for the position. Defendant's exhibit II, ¶ 4.

15. Defendant's exhibit C, ¶ 18 and attachment 18.

16. Plaintiff's exhibit A, ¶ 56.

17. Defendant's exhibit X, ¶ 2 and attachment 1.

Finally, the breach alleged by Malladi of ¶ 2.h, with respect to providing her with a non-discriminatory work environment, does not justify a release of her obligations under the settlement agreement. In this case, as discussed below, the court finds that Malladi has failed to state a claim on any of her subsequent allegations of discrimination, so there has been no breach of this contract term. Moreover, even if Malladi had successfully alleged a subsequent allegation of discrimination, contract terms, such as ¶ 2.h, cannot form the basis of a release because of several difficulties they pose. First, as a practical matter, the use of such a contractual term creates an on-going threat of invalidation of the contract for one party that never ends, and never allows for a complete execution of the contract. The practical difficulty is that the contract is never certain, and the underlying claims are always subject to being reopened and litigated. The court cannot continually revisit these claims in perpetuity with the everpresent possibility that it is going to have to litigate them.

Second, a contract term such as this is generally disfavored in contract law because it allows one party to gain unfair advantage by using as consideration a legal obligation it already has and cannot escape even in the absence of an additional contract. *In re Lloyd, Carr & Co.* 617 F.2d 882, 890 (1st Cir.1980); *see also Start v. Apple Computer, Inc.,* Civ. no. C95–20149 PVT, 1996 WL 161630, at *3 (N.D.Cal. March 29, 1996) ("Apple's promise not to discriminate is a preexisting legal obligation. Apple is already legally obligated to fulfill a duty not to discriminate under federal and state law.... As such, Start is legally entitled to nondiscriminatory, nonretaliatory treatment even in the absence of a written or oral contract. Further, Apple suffers no additional detriment in performing its legal obligation. Accordingly, Apple's promise to perform its preexisting duty is not legal consideration, and Start's breach of contract claim under her first theory fails."). The reasoning is that the party under the legal obligation can take unfair advantage of the other party by getting additional benefit for doing something it is already obliged to do by law. *See In re Lloyd,* 617 F.2d at 890 ("The policy

underlying this rule is to discourage parties under [preexisting legal] duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do."). A term like this is also troublesome to the court because it imposes additional punishment on the party under the legal obligation for breaching its duty, when the law has already directed the redress that is appropriate. Such an arrangement makes the additional contract seem unnecessary and unfair.

Finally, the law is not silent on these matters, and directs the process for dealing with claims of discrimination arising after parties have entered into a settlement agreement. In 29 C.F.R. § 1614.504(c), which covers compliance with settlement agreements and the processes for dealing with non-compliance, the regulations provide, in relevant part, that "[a]llegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate charges under § 1614.104 or § 1614.204, as appropriate, rather than under this section." Malladi has filed individual EEO charges for all the discrimination she alleges she has suffered. The effect of allowing her to bring both EEO charges and to seek release from her obligations under the settlement agreement is to allow her to double-dip—that is, it will allow her to get double benefit for any particular act of discrimination. The court cannot allow her to receive this double benefit.

Looking at the agreement as a whole, Malladi did receive the benefit she expected under ¶¶ 2.a, 2.b, 2.c, 2.e, 2.f, 2.g, and 2.i. There may have been a breach of ¶ 2.d, but the appropriate relief for this breach is an action for damages or specific performance, and not release from all obligations under the contract. Finally, the court does not find any violations of ¶ 2.h, but even if it did, such violations can be redressed by the existing anti-discrimination law, and the court will not sanction a view of this term that allows for perpetual review of the contract, unfair advantages to the parties to the contract, and double-dipping for one of the parties. Considering the foregoing, the court finds that there has not been a material breach of the settlement agreement, and that Malladi is

not entitled to be released from her obligations under that contract and to litigate the claims resolved in the settlement agreement. Consequently, any claims Malladi has with respect to her first seven EEO charges will be dismissed.

### B. Claims of Disparate Treatment Based on Race, Sex, or National Origin [18]

Title VII prohibits discrimination in employment on the basis of race, sex, or national origin. 42 U.S.C.A. § 2000e–2 (a)(1). In this case, Malladi does not attempt to show that she was discriminated against by way of direct evidence, but rather by way of circumstantial evidence. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases" based on circumstantial evidence. *St. Mary's Honor Ctr., v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993).

Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful discrimination by a preponderance of evidence. *St. Mary's*, 509 U.S. at 506, 113 S.Ct. at 2746–47. A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The prima-facie case of disparate treatment based on race, sex, or national origin is established when an employee shows that an employer simply treats some people less favorably than others because of their race, sex, or national origin. *United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir.1995) (citing *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994)).

Under the Title VII framework set forth in *McDonnell Douglas*, the "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden of production then shifts to the defendant to show that the adverse employment actions were taken for a "legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. As the Supreme Court has explained, the defendant's burden is one of production only, not persuasion. *St. Mary's*, 509 U.S. at 510–11, 113 S.Ct. at 2749. Once a defendant has articulated a nondiscriminatory reason, the presumption in favor of the plaintiff has been rebutted and disappears. *Id.* The disappearance of the presumption, however, does not compel summary judgment in favor of a Title VII defendant.[19] The "ultimate question" remains the same: whether the plaintiff can persuade the trier of fact that she has been the victim of intentional discrimination. *Id.* at 508, 113 S.Ct. at 2747–48.

"Where the defendant meets this burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir.1997) (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). "This demonstration merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against the plaintiff." *Holifield*, 115 F.3d at 1565.

In the summary judgment context, "[t]he burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext.... The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts [relating to the issue of pretext] at issue."

---

**18.** With respect to all of Malladi's claims of disparate treatment because of her race, sex, or national origin, she also alleges that she suffered disparate treatment because of her handicap. The handicap claims are discussed separately at § III.D, *infra*.

**19.** Rather, rebutting the presumption saves the defendant from summary judgment in favor of the plaintiff.

*Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir.1993).

### 1. Statements by Subordinate Employees

■ In her eleventh EEO charge, Malladi claims disparate treatment because of her race, sex, or national origin based on comments made by her subordinate employees to the EEO counselor investigating her ninth EEO charge. Malladi alleges that the employees' statements were inaccurate with respect to her workload and interpersonal skills, and that they had the effect of changing her work environment and ultimately leading to her reassignment. For this claim, Malladi is unable to make out the prima-facie case of disparate treatment.

■ For any discriminatory act to be actionable under Title VII, it must have been perpetrated by an employer or his agent. 42 U.S.C.A. § 2000e(b). Even construing the term 'agent' liberally, such a person must still be endowed with the traditional rights of the employer, such as the right to hire and fire the employee. *Garcia v. Elf Atochem N.A.*, 28 F.3d 446, 451 (5th Cir.1994) ("Under this liberal construction, immediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing") (emphasis removed); *see also Hamilton v. Rodgers*, 791 F.2d 439, 442–43 (5th Cir.1986) (construing the term employer to include immediate supervisors only when they "participated in the decision-making process that forms the basis of the discrimination"). It is therefore clear that "[t]here can be no liability under Title VII ... 'for the actions of mere co-workers'" *Garcia*, 28 F.3d at 451 (quoting *Harvey v. Blake*, 913 F.2d 226, 228 (5th Cir.1990)).

In this case, the employees, who Malladi alleges have perpetrated discrimination against her, do not fall within the definition of employer under Title VII. These employees do not perform any traditional employer functions, and, in fact, perform no functions that can impact the terms and conditions of Malladi's employment; they are her subordinates. In addition, Malladi does not allege that the VA in any way acted through these employees to perpetrate its discriminatory end, but only that their comments were significant in a change in her work environment

and were considered in the final actions by the VA that led to her reassignment. Even if this were true, it would fail to show a discriminatory motive at the time the employees' comments were made, thus eliminating any inference that the actions were motivated by Malladi's race, sex, or national origin. Because Malladi cannot state a prima-facie case on this claim, judgment will be entered against her on it.

### 2. Failure to Allege a Similarly–Situated Non–Minority Person

The remainder of Malladi's disparate-treatment claims based on race, sex, and national origin are without merit, first, because the non-minority person whom she names for comparison is not similarly-situated, or, second, because she fails even to name a person for comparison.

#### a. Inadequate Person Alleged

■ For a number of her claims of disparate treatment, Malladi has alleged a person to whom she says she is similarly-situated. Under the prevailing standards, however, these individuals do not qualify. To allege disparate treatment, Malladi must show that she was treated less favorably than a similarly-situated non-minority person. *Holifield*, 115 F.3d at 1562 (citing *Coutu v. Martin County Bd. Of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir.1995)). "To make a comparison of the plaintiff's treatment to that of nonminority employees, the plaintiff must show the [she] and the employees are similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562 (citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992) ("[T]o be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985)). "In determining whether employees are similarly situated for purposes of

establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield,* 115 F.3d at 1562 (citing *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1309 (8th Cir.1994)). The simple allegation that there was someone else, without an adequate showing that she is similarly-situated in all relevant respects, fails to make out the prima-facie case.

### i.

In the first allegation in her twelfth EEO charge, Malladi claims that she received disparate treatment because of her race, sex, or national origin as a result of inappropriate treatment by Kahane relating to her management of subordinate employees in two incidents in her service involving patient abuse and financial dealings with a patient. For this claim, Malladi has failed to make a showing that she was treated less favorably than a similarly-situated non-minority person.

Malladi alleges that she received less favorable treatment than Associate Medical Center Director Rollins, who knew about the financial dealings, but against whom no action was taken. The comparison of Malladi with Rollins fails because the evidence produced shows that they were not similarly situated. Rollins does not fall in the management structure above the employees in question, where he would have had an obligation to investigate the wrong-doing alleged against them, nor below Kahane, where he would have had an obligation to report his

knowledge to someone who was not his boss.[20] Malladi, on the other hand, fills a position directly above the employees, whose actions she is responsible for supervising, and directly below Kahane, who, as the chief of staff, should be informed by her of such events.[21] Considering the differences in their positions, one could not reasonably expect that Rollins would be treated the same as Malladi. The mere fact that he knew about the events does not suggest that he should be treated similarly to Malladi for failing to act on the information because his responsibilities at the hospital were different.

Rollins and Malladi are not similarly situated, and Malladi has not alleged any evidence about other similarly-situated persons being treated more favorably than her. Because Malladi cannot make out the prima-facie case for disparate treatment, this claim is without merit.

### ii.

In the fourth allegation in her twelfth EEO charge, Malladi claims that she received disparate treatment because of her race, sex, or national origin as a result of an unfair and inappropriate request for a site visit. The focus in this claim is on the VA's request for the site visit, not its reaction to or use of the findings from the visit; these latter issues are raised in Malladi's thirteenth EEO charge. For this claim, Malladi has not presented any clear evidence about who, if anyone, was in a similar position to her, and was having similar difficulties to those alleged against her, but was not subjected to a site visit.[22] It is alleged by the

---

20. Defendant's exhibit KK, ¶ 6.

21. Defendant's exhibit C, ¶¶ 2 and 22 and attachment 21.

22. Admittedly, as to this claim, Malladi points to two other service chiefs who received 'recommendations' after a JCAHO survey, but for whom no site visit was requested. The JCAHO survey is an annual survey that looks at the higher management structure of the hospital. As an initial matter, one of the recommendations that was given to one of the service chiefs was later reversed by JCAHO, so this undermines the basis on which Malladi alleges she was similarly situated to him.

Second, Malladi has made no showing that the JCAHO survey was at all relevant to the VA's

decision to request a site visit for her; the VA claims that it was not. Third, the court fails to see how the JCAHO survey was relevant to the issue of the request for a site visit. The site visit is clearly a more in-depth analysis of a service that could easily examine issues not addressed in the more general JCAHO survey. At the very minimum, a favorable rating in the JCAHO survey is by no means an immunization against a site visit to look at issues the survey does not address. Finally, the remaining evidence presented about the person to whom Malladi compares herself is not sufficient to determine if he is similarly-situated. Malladi received no recommendation for improvement in the JCAHO survey; whereas he did. The court also has no idea what issues were identified for improvement for the other person's service, so no analysis can be

VA that the site visit was requested because of Malladi's (1) refusal to accept management decisions, (2) failure to cooperate with management, (3) bad relations with subordinates, and (4) workload disputes.[23]

The only person mentioned who appears to bear any resemblance to Malladi is Thomas E. Kondrak, Chief of Recreation Service. Kondrak had a complaint lodged against him on May 27, 1993, by a number of his employees who sought his removal.[24] However, a site visit was ordered upon this complaint and other issues relating to the operation of his service and its interaction with other services, and it took place on July 1 and 2, 1993.[25] If anything, this evidence shows that Malladi was treated the same as a similarly-situated non-minority person, not less favorably.

In her reply brief, Malladi states that the comparison with Kondrak is meant to show that he "received significant employee complaints about his conduct, and he remained in his position."[26] Perhaps this is true, but it is inapposite to this charge, because this charge is based on the request for a site visit, not the VA's reaction to or use of the findings from the visit. With regard to the request for a site visit, Malladi was treated the same as the only similarly-situated person identified. Therefore, Malladi cannot make out the prima-facie case for this claim, and it is thus without merit.

### iii.

In the first, third, and fourth allegations in her thirteenth EEO charge, Malladi claims that she received disparate treatment because of her race, sex, or national origin as a result of her being detailed out of PM & RS to Ambulatory Care Service on January 19, 1996; the site visit team's report being

biased and unfair and targeting Dr. Malladi as the chief of PM & RS and as a physiatrist; and a reduction in her pay for her reassignment to a staff physician position in Ambulatory Care Service, which was not a reduction in base pay, but the loss of an increase given to her for serving as a service chief. Malladi attempts to compare her treatment in these matters to Kondrak, but his situation is not sufficiently similar to make an adequate comparison.

As discussed in the previous section, Kondrak had complaints registered against him by his subordinate employees, and had a site visit conducted of his service. When the site visit team reviewed his service, however, it gave some suggestions for improvement, but did not recommend that he be detailed from his service chief position to another job within the hospital.[27] In addition, there is no indication that the site visit was called for the same reasons, which makes it impossible to determine if Kondrak and Malladi are similarly situated. In light of these facts, and in the absence of more evidence, this is not enough. The simple fact, by itself, that Kondrak had a site visit will not suffice. With the evidence Malladi has presented, different treatment of the two could easily be expected from the VA, and thus she cannot make out a prima-facie case of disparate treatment. Consequently, these claims are without merit.

The court finds it appropriate to add a point of admonishment here for Malladi. In the her reply brief, while attempting to demonstrate the similarities between herself and Kondrak, Malladi quotes phrases from Kondrak's site visit team report out of context and thus gives the wrong impression of the conclusions the site visit team reached. In her

made of how the two compare. Considering the foregoing, the remaining individual cannot be considered adequate person to whom Malladi can be compared.

As best the court can tell, the assertions about these two individuals appear to boil down to Malladi's belief that she should not have had a site visit when she did not get a recommendation for improvement in the JCAHO survey, but this is not actionable as disparate impact in federal court.

23. Defendant's exhibit D, ¶ 8.

24. Defendant's exhibit LL, attached exhibit C.

25. Defendant's exhibit LL, ¶ 6 and attached exhibit D.

26. Plaintiff's reply brief in opposition to the defendant's motion for summary judgment, filed August 18, 1997, at 7.

27. Defendant's exhibit LL, ¶ 6 and attached exhibit D.

brief, Malladi indicates that the site visit team made reference to the "[l]ack of a working environment" in Kondrak's service,[28] when the report, in its entirety, identifies a "[l]ack of a working environment that empowers employees to be creative in the delivery of direct patient care programs."[29] This is a substantially narrower criticism than Malladi attempts to suggest. Malladi also points to the "poor working relationship" between Kondrak and another service chief,[30] but neglects to mention that the substantial majority of the criticisms about the "poor working relationship" are directed at the other service chief and not Kondrak.[31] If this is the approach Malladi needs to take to draw the comparison between herself and Kondrak, the court is even more convinced of the lack of actual evidence of the similarity.

iv.

■ In the second and seventh allegations in her thirteenth EEO charge, Malladi claims that she received disparate treatment because of her race, sex, or national origin, first, as a result of a meeting held by Clay and Kahane in which they informed the PM & RS staff that she had been detailed to another service before Malladi herself was notified, and, second, as a result of Kahane's actions that caused the keys to the chief of PM & RS office and government scooter to be taken away from Malladi on January 19, 1996, the same day she Malladi was detailed. Malladi alleges that there was a quality control manager, named Jeff Reiter, who was detailed, whose staff was not informed beforehand, and whose keys were not taken away so quickly, but this is all the information she provides. Malladi indicated that she did not know the circumstances surrounding the informing of Reiter's staff or his detail,[32] and specifically, that she had no idea if Reiter was out sick at the time his staff was to be informed,[33] like Malladi was. Malladi also fails to allege adequate information to help

the court compare Malladi to Reiter with respect to the taking of her keys. The court has no idea where Reiter fell in the management structure, who was responsible for informing his staff of his detail, or who was responsible for taking away his keys. Without more information, Reiter cannot qualify as a similarly-situated person adequate to serve as a person to whom Malladi can be compared. This claim is therefore meritless.

v.

■ In the fifth allegation in her thirteenth EEO charge, Malladi claims that she received disparate treatment because of her race, sex, or national origin as a result of Kahane's authorizing Malladi's former subordinate staff physiatrist to countersign her consultations, contrary to medical staff bylaws. Malladi alleges that a Dr. Pat, who was a neurologist who also did some work in surgery, was not required to have his consultations countersigned in surgery.[34] Malladi's own testimony indicates, however, that there was no other neurologist who worked in surgery who could countersign his consultations; he was the only neurologist working there.[35] Dr. Pat is, therefore, not an adequate person to whom Malladi can be compared. Beyond Dr. Pat, Malladi does not indicate any other persons who were in a similar situation to hers—that is, working in a service where they were not assigned, but had clinical licensing to practice in the area of medicine. In the absence of more information, this claim is meritless.

b. No Person Alleged

■ Malladi also has a number of claims where she does not name any other person to whom she can be compared. These claims are: the second and third allegations in her twelfth EEO charge, where Malladi claims that Clay made unreasonable delays in re-

---

**28.** Plaintiff's reply brief in opposition to defendant's motion for summary judgment, filed August 18, 1997, at 7.

**29.** Defendant's exhibit LL, attached exhibit D.

**30.** Plaintiff reply brief in opposition, at 7.

**31.** Defendant's exhibit LL, attached exhibit D.

**32.** Plaintiff's exhibit B, at 702–04.

**33.** *Id.* at 703–05.

**34.** Plaintiff's exhibit B, at 720–26.

**35.** *Id.*

sponding to Malladi's written request for an EEO counselor's report, and that there was an inappropriate referral on November 7, 1995, of her charges to the VA Central Office for procedural review; the sixth allegation in her thirteenth EEO charge, where Malladi also alleges that Clay inappropriately referred EEO cases filed by Malladi since August 1995, including January 2 and 22, 1996, for procedural review; and the eighth allegation of her thirteenth EEO charge, where Kahane gave Malladi a proposed memorandum of admonishment on February 16, 1996, and a subsequent memorandum or admonishment.

For all of these claims, Malladi has failed to allege any person who is similarly-situated to herself. In order to make out the prima-facie case of disparate treatment, Malladi must make this showing, or the court has no adequate person to whom it can compare her to see if she received disparate treatment. Because she has failed to allege such a person, these claims are meritless.

### C. Claims of Disparate Treatment Based on Handicap

■■■■ In each of the claims where Malladi alleges disparate treatment because of her race, sex, or national origin, Malladi also alleges that she received disparate treatment because of her handicap, in violation of the Rehabilitation Act.[36] In evaluating some claims of disability discrimination that are supported by circumstantial evidence, as Malladi's claims are, the court uses the burden-shifting framework set forth in *McDon-*

nell Douglas, and the cases that follow it, as an analytical guide.[37] *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994); *see supra* § III.B. The first stage of the framework requires that Malladi come forward and make out the prima-facie case of disparate treatment. To make out a prima-facie case of disparate treatment under the Rehabilitation Act, Malladi must show: (1) she is a "disabled person" under the Act; (2) she is "otherwise qualified" to perform her job; (3) she was treated differently from a similarly situated non-disabled person; and (4) her employer is a recipient of federal financial assistance. *Maddox v. University of Tennessee*, 62 F.3d 843, 846 (6th Cir.1995); *see also Heilweil*, 32 F.3d at 722. Once Malladi has made out the prima-facie case, this creates a presumption that she suffered disparate treatment and shifts the burden to the VA Secretary.

■■■■ In the second stage of the framework, the VA can defeat the presumption of discrimination by coming forward with a legitimate, non-discriminatory reason for the actions it took. The burden for the VA Secretary is one of production only, and not persuasion. Once the Secretary has presented this evidence, the presumption disappears, and the burden shifts back to Malladi to show that the VA Secretary's reason is a pretext for discrimination and that she was truly the victim of disparate treatment, which is the burden borne by Malladi at all stages.

Elements one, two, and four of the prima-facie case are not disputed by the VA Secre-

---

**36.** 29 U.S.C.A. § 794(a) provides, in relevant part, "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

**37.** There is some uncertainty in the case law as to the types of disability claims to which the burden-shifting framework should be applied under the Rehabilitation Act or the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101–12213. For instance, where an employer admits to having taken an employee's disability into consideration in reaching an adverse decision, application of the framework does not make much

sense. Nonetheless, it appears clear that the framework can be used for cases in which the employer has disclaimed any consideration of the employee's disability. *See, e.g., Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1184–85 (6th Cir.1996) ("A *McDonnell Douglas* burden-shifting type analysis will, however, be appropriate in some disability discrimination cases. In cases in which the plaintiff has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's disability, the plaintiff may attempt to establish his or her claim indirectly through the burden shifting method borrowed from *McDonnell Douglas* by establishing a prima facie case of discrimination and shifting the burden to the employer to offer a legitimate, nondiscriminatory reason for its action.").

tary. The Secretary does not contest that Malladi is a handicapped or disabled person under the Act, that she is "otherwise qualified," or that her employer is a recipient of federal financial assistance.

The VA Secretary contends that there are only two allegations made by Malladi in all of her EEO charges where there is even a question that Malladi received disparate treatment because of her disability—Kahane's completion of her "appraisal of applicant" form (as alleged in her first EEO charge) and the request for the return of the keys to the government scooter (as alleged in her thirteenth EEO charge). Although there are numerous other allegations in Malladi's first, eleventh, twelfth, and thirteenth EEO charges, she does not contend in any of her responses to the motion for summary judgment that any of the others raise issues where Malladi was discriminated against because of her disability. The court, therefore, must conclude that Malladi cannot make out her prima-facie of discrimination under the Rehabilitation Act, and all such claims are meritless.

As for the allegation that the VA discriminated against Malladi because of her disability by Kahane's completion of her "appraisal of applicant" form, that allegation is covered by the settlement agreement entered into by the parties on March 30, 1995. The court has already determined that this claim must be dismissed because there was no material breach of that agreement.

■ Malladi's claim regarding the return of the keys to the government scooter is frivolous. The uncontradicted evidence shows that Malladi returned the key to her scooter along with her other keys when she was detailed from PM & RS on a Friday, and that the following Monday, when she requested that the key be returned to her, it was returned immediately. There is no evidence that the key to the scooter was asked for specifically or that it was asked for in anything but the normal course of asking for keys to be returned when they are no longer

needed. Any suggestion to the contrary is belied by the fact that almost immediately upon request, the key was returned to Malladi. And beyond that, Malladi was only without the scooter key for two days—over a weekend—and there was not even any allegation that the scooter was needed during the time Malladi did not have its key. This claim is meritless.

### D. Retaliation Claims

Malladi makes allegations of retaliation in all six of the EEO charges being considered by the court in this order. Title VII provides protection against retaliation for those who oppose discrimination or participate in Title VII processes.[38] In evaluating claims of retaliation that are supported by circumstantial evidence, as Malladi's claim are, the court uses the burden-shifting framework set forth in *McDonnell Douglas,* and the cases that follow it, as an analytical guide. *Meeks v. Computer Assoc. Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994); *see supra* § III.B.

■ The first stage of the framework requires that Malladi come forward and make out the prima-facie case of retaliation. To establish a prima-facie case of retaliation, Malladi must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse job action; and (3) there is a causal relationship between (1) and (2). *Meeks,* 15 F.3d at 1021. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of the discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." *Holifield,* 115 F.3d at 1566 (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989)). Once Malladi has made out the prima-facie case, this creates a presumption that she suffered retaliation and shifts the burden to the VA Secretary.

■ In the second stage of the framework, the VA Secretary can defeat the pre-

---

**38.** "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]." 42 U.S.C.A. § 2000e–3(a).

sumption of retaliation by coming forward with a legitimate, non-retaliatory reason for the actions it took. The burden for the VA Secretary is one of production only, and not persuasion. Once the VA Secretary has presented this evidence, the presumption disappears, and the burden shifts back to Malladi to show that the VA Secretary's reason is a pretext for retaliation and that she was truly the victim of retaliation, which is the burden borne by Malladi at all stages.

In this case, there is no dispute that Malladi engaged in protected activity—that is, she filed EEO charges. To show that she suffered an "adverse job action," Malladi must demonstrate that the job action affected "a term or condition of employment and [the job action] is not adverse merely because the employee dislikes it or disagrees with it." *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996). The contours of what constitutes a "term or condition of employment" are not well developed in this circuit, but *Wu v. Thomas,* 996 F.2d 271 (11th Cir.1993), indicated that it must be something like a loss of salary, benefits, or position. *Id.* at 273. Not all employment actions are actionable under Title VII. *Id.; see also Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981) ("[T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions ... of Title VII."). Other circuits follow this general approach. *See, e.g., Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (" 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' ") (quoting *Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995)); *Jeffries v. State of Kansas,* 946 F.Supp. 1556, 1567 (D. Kan. 1996) ("Although adverse job actions cover more than quantifiable losses of salary or benefits, 'not everything that makes an employee unhappy is an actionable adverse action.' *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). To be actionable, the adverse employment action must be 'material:' '[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' *Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank & Trust,* 993 F.2d 132, 136 (7th Cir.1993)).").

In analyzing an adverse employment action, it should be noted that "an adverse employment action does not, however, have to be an immediate economic injury. Some courts in addressing the issue of retaliation have identified a 'range of acts as adverse, based upon the scope of their consequences.' *Boyd* [*v. Brookstone Corp. of New Hampshire,* 857 F.Supp. 1568, 1572 (S.D.Fla. 1994) ]. A term or condition of employment may be said to have been affected if there is a 'demonstrable adverse impact on future employment opportunities or performances.' *Fortner* [*v. State of Kansas,* 934 F.Supp. 1252, 1266 (D. Kan. 1996) ]." *Perryman,* 949 F.Supp. at 819.

For proof of the causal link, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated," *EEOC v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571–72 (11th Cir.1993), but the employee "must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Holifield,* 115 F.3d at 1566 (citing *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993)).

### 1. Failure to Allege an Adverse Job Action

In the six EEO charges being considered by the court in this order, Malladi has made twelve allegations of retaliation that fail to meet the very minimum requirements to make out a prima-facie case of retaliation.

In order to make out the prima-facie case of retaliation, Malladi must allege that she suffered an adverse job action. "Adverse job action" is a term of art that has a legal meaning requiring that any contested job action must affect one of the "terms and conditions" of Malladi's employment in order to be adverse. The simple fact that Malladi considers the job action to be adverse does not raise it to the level of an adverse job action, and certainly does not support a charge of retaliation.

The allegations made by Malladi that do not amount to adverse job action, and thus fail to make out a prima-facie case of retaliation, are: (1) the second allegation in her eighth EEO charge, that Kahane's administrative assistant telephoned her at home while she was on sick leave to see if she could return to work; (2) her third allegation in her eighth EEO charge, that she was denied her request to cancel the outpatient rehabilitation clinic and electromyography test; (3) her first allegation in her tenth EEO charge, that there was a breach of the settlement agreement; (4) her second allegation in her tenth EEO charge, that Kahane treated her improperly by allegedly shouting at her in front of her subordinates; (5) her allegation in her eleventh EEO charge, that the statements made by her subordinate employees to the EEO counselor in the course of the investigation of her ninth EEO charge were retaliatory; (6) her first allegation in her twelfth EEO charge, that Kahane treated her inappropriately relative to her management of subordinate employees in two incidents in her service involving patient abuse and financial dealing with a patient; (7) her second allegation in her twelfth EEO charge, that Clay made unreasonable delays in responding to Malladi's written request for an EEO counselor's report; (8) her third allegation in her twelfth EEO charge, that there was an inappropriate referral of her charges to the VA central office for procedural review; (9) her second allegation in her thirteenth EEO charge, that the PM & RS staff was informed that she had been detailed to another service and removed as chief of PM & RS before she was notified; (10) her fifth allegation in her thirteenth EEO charge, that Kahane authorized her former subordinate to countersign Malladi's consultations; (11) her sixth allegation in her thirteenth EEO charge, that Clay inappropriately referred EEO charges for procedural review; and (12) her seventh allegation in her thirteenth EEO charge, that Kahane caused the keys to her chief of PM & RS office and to the government scooter to be taken from her the day she was detailed from PM & RS.

■ Malladi's allegation that she suffered an adverse job action because she was telephoned by the VA while she was at home on sick leave is patently meritless. There has been no credible showing that the phone call was anything other than that—a phone call to check Malladi's availability to cover the absence of another physician. Even if it can be assumed that the VA knew she was unavailable when it called, there is no indication that the phone call was in any way used to influence the terms and conditions of Malladi's employment, and thus does not amount to an adverse job action. Consequently, this allegation of retaliation is without foundation.

■ The argument that Malladi suffered an adverse job action because of the denial of her request to cancel the outpatient rehabilitation clinic and electromyography test is also clearly without merit. In her EEO charge, Malladi claims that she suffered "unnecessary stress and harassment" because she was overworked that day, that she was distracted at the lecture and during her work, and that it was very hard to balance all these tasks, all of which led to "personal dissatisfaction which wasted my energies for some time."[39] Even if all of this were true, it has absolutely no impact on the terms and conditions of her employment, does not amount to an adverse job action, and is thus meritless.

■ Malladi alleges an adverse job action based on the alleged breach of the settlement agreement she entered into with the VA, because, she submits, "the Defendant created terms, conditions, and privileges of employment in this case when it entered into the settlement agreement with Dr. Malladi on

**39.** Defendant's exhibit Y, at 4.

March 30, 1995." [40] Malladi offers no authority for this proposition, and it is completely baseless. Her settlement agreement created a contract between her and the VA that is treated like any other contract, and that has no bearing on her salary, benefits, or position. It also created a completely separate means of resolving any claims of breach through the rules of contract law. These rules call for a separate action for enforcement of the agreement, or an action seeking a release of Malladi from her obligations under the contract, but they do not give rise to separate claims of retaliation for any alleged breaches of the agreement. This claim is therefore meritless.

 The claim that Kahane's shouting at Malladi in front of her subordinates amounts to an adverse job action is without merit. Although not favored, some minimal amount of criticism or reprimand of employees, even with raised voices, is a routine occurrence in a work environment, and it does not amount to an adverse job action. *See, e.g., Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1298 (3d Cir.1997) (rejecting the plaintiff's contention that "unjust reprimands" constituted discrimination because they did not "[r]ise to the level of conduct affecting [the plaintiff's] 'compensation, terms, conditions, or privileges' of employment," and observing that "not every insult, slight or unpleasantness gives rise to a valid Title VII claim"); *Jeffries,* 946 F.Supp. at 1568; *Nelson v. University of Maine Sys.,* 923 F.Supp. 275, 282 (D.Me.1996) ("[T]he Court views employee criticism, as with employee praise, as a normal incident of the working relationship between supervisors and those in their charge. Employee evaluation, important to both the employee and the employer, should not be hindered because of the important purposes it serves in improving both employee performance, and employer satisfaction."); *Simmerman v. Hardee's Food Sys., Inc.,* No. 94–6906, 1996 WL 131948, at *14 (E.D.Pa. Mar.22, 1996) ("mere criticism and counseling alone do not constitute 'adverse action'"); *Lefevre v. Design Prof'l Ins. Cos. & Thomas Coppinger,* No. C–93–20720 RPA, 1994 WL 544430 at *1

(N.D.Cal. Sept.27, 1994) (harsh criticism of an employee's work does not constitute adverse employment action under Title VII). No matter how badly Malladi may have felt if Kahane did in fact shout at her, unless the tension is shown to have affected the terms of conditions of her employment, it does not amount to an adverse job action. Because Malladi makes no such showing, this allegation is without foundation.

 Retaliation must be perpetrated by Malladi's employer or its agent for it to fall within the proscription of Title VII or the Rehabilitation Act. 42 U.S.C.A. § 2000e(b). The statements of Malladi's subordinate employees to the EEO counselor do not fall within this proscription. *See, e.g., Garcia,* 28 F.3d at 451; *Hamilton,* 791 F.2d at 442–43. Even if it were possible for her subordinate employees' statements to be considered retaliation under Title VII or the Rehabilitation Act, there is no showing of how they affected the terms and conditions of her employment. Malladi claims that the statements were made by the employees, which provided a basis for Clay's procedural review of Malladi's other EEO charges and the request for a site visit, which in turn harmed Malladi's personal and professional image, and presumably allowed the administration to detail and reassign Malladi. Although Malladi is entitled to every reasonable inference based on the evidence she has presented, she is not entitled to every possible inference she can imagine, and, without further supporting evidence, this is far too fanciful an inference upon inference for the court to draw. There is no credible evidence that the statements by Malladi's subordinate employees amounted to an adverse job action, and thus this claim is meritless.

 Malladi alleges that she suffered an adverse job action because of Kahane's inappropriate treatment of her in regard to her management of subordinate employees in two incidents involving patient abuse and financial dealing with a patient. This claim also without merit. Kahane says that Malladi did not act appropriately and that she did not follow his orders; Malladi says she did.

---

**40.** Plaintiff's opposition to defendant's motion for summary judgment, at 46.

Kahane wrote a memorandum allegedly blaming Malladi for what he believed to be Malladi's inappropriate actions, and Malladi wrote a memorandum defending herself. No matter how these issues are resolved, and who was right and who was wrong, there is no showing that this exchange had any effect on the terms and conditions of Malladi's employment. There was clearly a dispute here, but there is nothing that amounts to an adverse job action.[41]

■ Malladi makes three separate claims that she suffered adverse job actions because of an unreasonable delay in responding to her written request for an EEO counselor's report and the inappropriate referral of her charges to the VA central office for procedural review. None of these claims amounts to an adverse job action because there has been no showing of how these actions affected the terms and conditions of Malladi's employment. *See, e.g., Boyd,* 857 F.Supp. at 1573 ("alleged actions in obtaining manufactured evidence, and submitting the evidence to the EEOC, do not implicate 'employment' in any form or manner"). Although these actions may conceivably have some bearing on the EEO processes to which they relate, this has no bearing on Malladi's salary, benefits, or position, and thus cannot support a charge of retaliation. All three of these claims are meritless.

■ The fact that Clay and Kahane informed the PM & RS staff that Malladi had been detailed to another service and removed as chief of the service before she was notified also does not amount to an adverse job action. In her EEO charge, Malladi claims that as a result of this action she was subjected to humiliation, harassment, discrimination, a loss of self esteem and morale, and mental torture. The court cannot help but conclude that Malladi is being a bit overly dramatic in her statement of the effect this action had on her, but even if the court were to assume that she suffered some embarrassment and anguish as a result of this action,

there has been no showing of how this action effected the terms and conditions of Malladi's employment. Although this action could safely be frowned upon by the court as an inappropriate way to proceed, it does not amount to an adverse job action, and is thus meritless.

■ Malladi alleges that she suffered an adverse job action when Kahane authorized her former subordinate to countersign her consultations. This action took place after Malladi had been detailed out of the PM & RS service and was no longer generally assigned to see patients within that service. Malladi's former subordinate then became the acting chief of PM & RS with all the responsibility for the treatment within the service. In her EEO charge, Malladi claims that this action defamed and humiliated her, and undermined her clinical privileges. Again, even if this were true, this action was taken as part of the normal actions taken as a reassignment within the hospital, and had no impact on Malladi's salary, benefits, or position. It is therefore without foundation.

■ Finally, Malladi alleges that she suffered an adverse job action when Kahane caused the keys to the chief of PM & RS office and to the government scooter to be taken from her the day she was detailed from PM & RS. These actions do not amount to an adverse job action either. The taking of her keys to the PM & RS service when she was no longer assigned there did not affect the terms and conditions of her employment. The assertion that the taking of her key to the government scooter amounts to an adverse job action is meritless. Malladi's keys were taken from her on January 19, 1996, which was a Friday, and upon her request on January 23, 1996, which was a Tuesday, were returned to her. At most, Malladi was without the scooter for two workdays, and there is no indication that she needed the scooter at that time; in fact, the evidence suggests she only used it approximately once per month. In any event, Malla-

---

41. Admittedly, this set of circumstances led to an admonishment for Malladi. The admonishment, however, had not taken place before Malladi filed her twelfth EEO charge. The court must therefore conclude that Malladi is taking issue with the other events surrounding Kahane's treatment of her. The court is also led to this conclusion because the admonishment is covered by the eighth allegation in Malladi's thirteenth EEO charge.

di makes no showing that the absence of the scooter had any impact on the terms and conditions of her employment, and it therefore does not amount to an adverse job action.

### 2. Hiring Requests

■ Malladi alleges that she was retaliated against for engaging in protected employment activity because (1), as alleged in her eighth EEO charge, her May 1995 request to hire a staff physiatrist was denied, and (2), as alleged in her ninth EEO charge, her August 1995 request to hire a staff physiatrist was denied. Malladi has alleged facts sufficient to make out the prima-facie case of retaliation based on these charges.

The VA Secretary does not contest that Malladi engaged in protected activity (the filing of EEO charges), and it cannot be sensibly contended that the VA did not have knowledge of Malladi's protected activity before it denied all of Malladi's hiring requests. As for the adverse job action suffered by Malladi, there is a long and complicated history of Malladi's requests for additional physician staffing, and from this history there is sufficient evidence to show that, if the court makes all reasonable inferences as it is required to do, Malladi suffered an adverse job action by having her requests for additional staffing continually denied.

Malladi alleges that she was the fourth physiatrist hired when she first joined PM & RS,[42] and that PM & RS has been shorthanded since August 1992, when the third physiatrist position in PM & RS was vacated. She had been continually recruiting, but had had no qualified applicants until February 1994. Malladi made three requests to hire a staff physiatrist that were denied prior to the ones covered in her eighth and ninth EEO charges—two were in February 1994[43] and one was in December 1994. In November 1994, Malladi also requested that she be allowed to hire a physical therapist and an occupational therapist, and these requests were denied.[44]

On May 12, 1995, Malladi made another request to be allowed to recruit and hire a staff physiatrist.[45] After a meeting with Clay and Kahane, Kahane sent Malladi a memorandum denying her request and explained that such disapproval came only after "many, many reviews" and that it was being denied because of the hospital's limited resources.[46] In August 1995, Malladi alleges she made a verbal request to the associate director of the medical center to hire a staff physiatrist.[47] At the August 23, 1995, meeting of the Resources Committee, while her request was denied for inadequate funds, staffing position allotment, and lack of demonstrated need, the committee received an oral request to fill two positions in Medical Services.[48] The decision on these two positions was deferred.[49] Malladi alleges that these two positions were ultimately filled, and that the requesting service chief was not required to provide workload statistics like she was made to provide with her requests.[50]

The repeated requests for more staffing, along with the on-going dispute Malladi was having with the management over her workload and the staff required to meet the workload, formed one of the bases on which the TVAMC management sought a site visit of Malladi's service.[51] Together, the request for the site visit and the site visit itself, began the steps that led to Malladi's detail, to the negative site visit team report, and to her reduction in pay, all of which have no

---

42. Plaintiff's exhibit B, at 390.

43. Defendant's exhibit C, ¶ 12, and defendant's exhibit D, ¶ 3 and attachment 2.

44. Defendant's exhibit C, ¶ 15, and attachment 14.

45. Defendant's exhibit Y.

46. Defendant's exhibit C, ¶ 19, and attachment 19.

47. Defendant's exhibit Z.

48. Defendant's exhibit C, ¶ 21, and attachment 20.

49. Defendant's exhibit C, ¶ 21, and attachment 20.

50. Defendant's exhibit Z; Plaintiff's exhibit B, at 489–92.

51. Defendant's exhibit D, ¶ 8.

doubt had a serious impact on the terms and conditions of her employment. This evidence submitted by Malladi is sufficient to make out a prima-facie case of retaliation.

■ In response to Malladi's claims of retaliation, the VA Secretary has come forward with legitimate, non-discriminatory reasons for its denial of Malladi's hiring requests. In many, varied documents, the VA asserts that Malladi's workload did not justify additional physician staff, the VA did not have sufficient funds to hire additional physician staff, and Malladi's service lacked approved physician staffing positions into which she could hire a new person. This proffer of this evidence is more than sufficient to meet the VA Secretary's burden and defeat the presumption that the VA retaliated against Malladi.

■ The VA Secretary having come forward with legitimate, non-discriminatory reasons for its actions, the burden shifts back to Malladi to show that there are material issues of fact relating to whether the VA's reasons are pretext for retaliation, and thus that she was truly retaliated against. Malladi has not carried her burden in this phase. To attempt to carry this burden, Malladi relies on a number of facts that do not even suggest that retaliation was motivating the VA's actions. She points to the VA's continued insistence that she did not need more staff, and its continued insistence that her workload statistics were erroneous. The court does not see how these raise any question at all that the VA was motivated by a retaliatory motive in denying her hiring requests. They certainly point to a disagreement, which Malladi may feel is retaliatory, but her bare assertions of the retaliatory connection are not enough to survive summary judgment.

Malladi also relies very heavily on the site visit team's report, and the one finding in particular that the site visit team identified a sense of concern from the management and from other people at TVAMC concerning Malladi's history of EEO charges. This finding brings the issue of Malladi's EEO charges to the fore, but, in light of the evidence presented, the court cannot conclude that it points to a retaliatory motive. Malla-

di had a long and distinguished history of filing EEO charges, and it would have been curious if, in investigating her service, this issue had not come up. It would have been impossible to avoid it. When one person files approximately ten EEO charges in the preceding three-year period, the filing of charges would reasonably become itself a dominant theme in the workplace. The VA Secretary insists, and presents considerable evidence from the site visit team members and the employees of TVAMC to the same effect, that the written finding was not intended to indicate that management was driven by the EEO charges in any of its decisions, but simply that the charges were a significant theme in its interaction with Malladi. The site visit team wrote: "As a result of the continued filing [of EEO complaints], the members of the triad feel incapacitated in providing the Chief with adequate direction and assistance in management of her service." The court completely understands this conclusion because Malladi appears to have filed an EEO charge on every conceivable ground she could imagine, no matter how frivolous. And beyond this one finding, and the other bases that Malladi has identified that do not point to a retaliatory motive, she has not presented any other evidence that calls into question the VA's non-retaliatory reasons or makes the court think that these reasons were false or pretext for retaliation.

■ Indeed, an employee, such as Malladi, must not be allowed to bootstrap her own abuse of the work environment into a retaliation claim. In other words, an employee should not be allowed to flood an employer with EEO charges, many of which are frivolous, and then claim that, because the filings have adversely affected her work environment, she is a victim of retaliation. *Cf. Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir.1989) ("The record reveals, and the trial court found, that FDLE denied Rollins' applications for promotions because she had earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit. Such conduct, even when associated with complaints of discrimination, has been held

to fall outside the protection of [Title VII] and to provide the employer with a legitimate basis for its action."). In that instance, the employee, not the employer, was responsible for adverse work environment, and here the record overwhelmingly reflects that such was the case with Malladi.

The court is mindful of Eleventh Circuit precedent that sets the relatively low standard for Malladi to survive summary judgment, *see Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir.1993) ("The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue."), and the precedent that directs that questions of motive or intent are best resolved by the jury, *see Pearson v. Macon–Bibb County Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir.1992) (" '[S]ummary judgment is not a proper vehicle for resolving claims of employment discrimination which ... turn on an employer's motivation and intent.' ") (quoting *Delgado v. Lockheed–Georgia Co.*, 815 F.2d 641, 644 (11th Cir. 1987)). Nonetheless, Malladi has not presented evidence sufficient to put issues of pretext in question. The evidence presented leads the court to only one reasonable conclusion: that Malladi has presented frivolous claim upon frivolous claim, and is now trying to use these claims to hold the VA hostage under a retaliation theory for being concerned about this long history of charges. This court will not sanction this because it simply sees no evidence that retaliation was motivating the VA. The court only sees an employer that was in an exceptionally difficult situation, and the difficulty will not be compounded here.

### 3. Site Visit, Detail, Reassignment, and Admonishment

■ Malladi alleges that she was retaliated against for engaging in protected employment activity based on several incidents surrounding her eventual reassignment from her position as chief of PM & RS. Her specific allegations of retaliation include the following: (1) there was an unfair and inappropriate request for a site visit team visit, as alleged in her twelfth EEO charge; (2) she was detailed from PM & RS to Ambulatory Care, as alleged in her thirteenth EEO charge; (3) the site visit team's report was biased and unfair and targeted Malladi as chief of PM & RS and as a physiatrist, as alleged in her thirteenth EEO charge; (4) her detail had a corresponding reduction in pay of $8,250 annually, which represented the loss of pay for being a service chief and not a reduction in her base pay, as alleged in her thirteenth EEO charge; and (5) Kahane gave her a proposed memorandum of admonishment and the subsequent memorandum of admonishment, as alleged in her thirteenth EEO charge. The VA Secretary concedes that allegations (2) through (5) constitute adverse job actions, and because the VA Secretary already conceded that Malladi was engaged in protected activity, and the Secretary was well aware of Malladi's history of filing EEO charges prior to the occurrence of these events, Malladi has made out the prima-facie case of retaliation. The court also find that Malladi meets the prima-facie case for allegation (1) because the court believes it to be part and parcel of other four.

■ To meet his burden in the second stage of the *McDonnell Douglas* burden-shifting analysis, the VA Secretary has come forward with legitimate, non-retaliatory reasons for his actions. The VA Secretary has presented evidence of the long and twisted history of complaints and dissatisfaction with Malladi's management of her service and her interaction with the management of TVAMC. To explain its decision to detail and ultimately reassign Malladi, the management relied specifically on the site visit team's report. This report detailed problems with Malladi's

management, including a lack of planning and effective control of the service, problems with her relationship with her staff, including low morale, infighting, fear of her retaliation, a lack of communication, and problems with her relationship with TVAMC management. To explain and justify the admonishment of Malladi for her management of her employees, the VA Secretary points to the severity of the offense, the continued working of the offending employee in patient care during Malladi's delay in informing the chief of staff of the offense, and Malladi's length of service, all as factors that should have prompted different action by Malladi but did not. This evidence presents more than enough of a legitimate, non-discriminatory explanation for the VA's actions against Malladi, and thus defeats the presumption that the VA retaliated against Malladi.

■ Since the VA has come forward with legitimate, non-discriminatory reasons for its action, the burden then shifts back to Malladi to demonstrate that the reasons are pretext for retaliation and that she truly suffered retaliation. To carry her burden here, Malladi relies on the same evidence she relied upon in attempting to carry her burden for the denial of her hiring requests. She points to the continual denial of her hiring requests, and the continued disagreement about her workload statistics. Again, the court does not see how these in any way indicate that the VA was driven by a retaliatory motive. Malladi also points to the site visit team's finding in its report that Malladi's EEO charges were a predominant theme at the VA during the time of the site visit team's review. This unquestionably points to the fact that the EEO charges were a significant occurrence at the VA, but, as already stated in the preceding section, the court cannot imagine how it could be otherwise. With Malladi's history of filing EEO charges, the charges must have been significant to the management and must have had a substantial impact on the management's interaction with Malladi. This piece of evidence alone, particularly in light of the evidence presented by the VA Secretary that the finding was not meant to suggest that the management was

motivated to take action by the EEO charges, is not sufficient to raise a question about the management's motives. And Malladi has presented no other evidence that the VA's reasons were not justified and legitimate, and served as pretext for discrimination. She simply points to the fact that they were continually under the shadow of the EEO charges and that it was known around the hospital. With this one piece of evidence, the court is only led to one conclusion by the evidence presented—that, as stated, Malladi has presented frivolous claim upon frivolous claim, and is now trying to use these claims to hold the VA hostage under a retaliation theory for being concerned about this long history of charges. This piece of evidence will not suffice to survive summary judgment.

E. Review of Grievances under the APA

The final agency decisions with respect to Malladi's grievances are subject to judicial review under the APA. In this case, Malladi challenges three of her formal grievances on various grounds. First, Malladi challenges her grievance with respect to her proficiency rating on the ground that the VA did not comply with the procedures it has adopted to govern its action; second, she challenges her grievance with respect to her letter of admonishment on the ground that the evidence did not support the conclusion reached by the grievance examiner; and, finally, she challenges her grievance with respect to her permanent reassignment on the ground that the VA's characterization of her grievance as non-disciplinary deprived her of rights she should have been afforded under the procedures governing disciplinary actions.

■ At the summary judgment stage, the court does not look at whether there is a genuine issue of material fact, but instead turns directly to the question of the validity of the challenge. *See, e.g., Good Samaritan Hosp., Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979). In evaluating these challenges, the court uses the statutory stan-

dards designated in 5 U.S.C.A. § 706(2).[52] The court may set aside an agency action, finding, or conclusion under the standard in § 706(2)(A), where the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.", *The Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir.1996). This standard is exceedingly deferential to the agency's decision. *Id.*[53] An agency decision can also be set aside under the standard set forth in § 706(2)(D), which targets decisions that are "without observance of procedure required by law." The procedure required by law is determined by the statutes and regulations under which the agency's action was taken. The agency is bound by the terms of the regulations it enacts according to Congressional authority, because validly enacted regulations have the force of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979). The binding of the agency to its regulations does not apply to every policy the agency adopts, but to only to regulations adopted according to Congressional authority. In all of her challenges, Malladi bears the burden of establishing the validity of her challenge.

### 1. Proficiency Rating

■■■ Malladi seeks review of the VA's decision to deny consideration of her griev-ance with respect to her proficiency rating. She claims that she is not taking issue with the actual rating she received, but with the VA's contravention of its procedure that requires counseling of an employee before a less-than-satisfactory rating is given.[54] The VA's basis for denying consideration of the grievance is the section of its procedures that identifies matters excluded from coverage under the grievance procedure, specifically, "Complaints arising from dissatisfaction with proficiency rating."[55] The VA's letter informing Malladi of the denial of consideration of this grievance concluded that because the anticipated remedy for a challenge to the contravention of the procedure would have the effect of voiding the proficiency rating, it was within the scope of the types of grievances excluded.[56]

Considering the literal language of the exclusion identified by the VA Secretary, the court believes this grievance falls within the exclusion. Malladi's grievance arises generally out of her dissatisfaction with her proficiency rating—that she was not given notice ahead of time, with an opportunity to respond, and conceivably mend her ways. The court is not convinced that the procedure Malladi alleges that the VA failed to follow was obligatory on the VA in this situation.

---

**52.** Section 706 provides:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

**53.** "To determine whether an agency decision was arbitrary and capricious, the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ... '[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.' ... The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *The Fund for Animals*, 85 F.3d at 541–42 (citations omitted).

**54.** Defendant's exhibit HH, grievance of proficiency rating booklet, at tab E.

**55.** Defendant's exhibit GG, at 8B–7.

**56.** Defendant's exhibit HH, grievance of proficiency rating booklet, at tab 1.

There is no question that the regulations of the VA have the force of law and must be followed by the agency. The small excerpt that Malladi included in her submission to the grievance examiner appears to be part of the official regulations promulgated by the department.[57] The specific language of § (e)(1) on the page submitted states, in relevant part, "At any time during the appraisal period when performance problems are observed which may be expected to result in a low[/minimally] satisfactory or unsatisfactory annual proficiency rating, the rating official will hold a counseling conference with the employee sufficiently in advance of the due date of the annual report to inform the employee of the deficiencies, give the employee a reasonable opportunity to correct identified deficiencies and demonstrate satisfactory performance, as follows: (a) For a permanent employee ... for whom a low[/minimally] satisfactory or unsatisfactory annual or special proficiency rating is to serve as a basis for action under MP–5, Part II, Chapter 8 and its [VHA] Supplement, the documented counseling requirements ... must be met .... (b) For all other employees, the documented counseling requirements ... are recommended." [58]

Counseling of employees for low or unsatisfactory ratings is clearly not a universal requirement under the VA regulations, and is mandatory in only a very limited set of circumstances. It is only required where the proficiency rating is to serve as the basis for action under the section that covers disciplinary actions and grievance procedures. The court interprets the phrase "basis for action" to refer to a disciplinary action or major adverse action, which are covered by part A of chapter 8 of the regulations. As discussed below, see infra § III.E.3, the categories "disciplinary action" and "major adverse action" include: admonishment, reprimand, suspension, transfer, reduction in grade, re-

duction in basic pay, and discharge.[59] The lowered proficiency rating that Malladi received has not formed the basis for any such action; in fact, to the best of the court's knowledge, it has not been used for any purpose at all. Because the rating has not formed the basis of an action under the section designated, the lowering of the proficiency rating here does not fall within the law governing the VA's actions, and is not relevant to the VA's grievance.

Along with the excerpt from the official regulations, Malladi also includes a policy memorandum, number 05–93–32, which appears to have been circulated around TVAMC. This memorandum directs that counseling of employees is required whenever a proficiency rating is given, but this memorandum does not indicate that it was issued according to the VA's authority as conferred by Congress. As such, this memorandum does not have the force of law in the proficiency rating process like the other regulations promulgated by the VA, and it therefore cannot serve as the basis of a policy the VA must follow in giving Malladi a proficiency rating. Malladi's challenge to this grievance is therefore without merit.

### 2. Letter of Admonishment

■ Malladi seeks review of the grievance examiner's report with respect to her letter of admonishment for her handling of patient/employee matters because, as Malladi alleges, she was inappropriately admonished. In summarizing her challenge to the grievance she states, "[t]here is ample evidence in the record to demonstrate that Dr. Malladi was treated arbitrarily in her admonishment for not reporting an incident, when it is clear that she followed existing policy, was not found culpable by the investigating boards, and when a person holding a position superior to hers was not disciplined for the same

---

**57.** The court reaches the conclusion that these are the official regulations promulgated by the VA, as published in the Federal Register, by inference. In a Westlaw search looking for MP–5 Part II, Chapter 8, which is the portion of the VA's regulations addressing disciplinary actions and grievance procedures, and which was provided to the court in defendant's exhibit GG, the court located it in 57 Federal Register 3815 (1992), 1992 WL 14293. The excerpt furnished

by the plaintiff appears to be from Chapter 6 of the same set of regulations, although it could not be located in the on-line Federal Register.

**58.** Defendant's exhibit HH, grievance of proficiency rating booklet, at tab E.

**59.** Defendant's exhibit GG, at 8–2 to 8–3.

reasons."[60] What Malladi neglects to recognize is that this is her interpretation of the evidence in the administrative record, and that there is also ample evidence in the record to support the conclusion that Malladi acted inappropriately and in contradiction to VA policy, that her actions potentially endangered patient well-being by not expeditiously removing a potentially dangerous staff member from patient care, and that a letter of admonishment was more than appropriate.

After examining the evidence in the record, the court finds that Malladi's challenge represents nothing other than a difference of opinion with the conclusion of the grievance examiner. It certainly does not lead to the court to conclude that the grievance examiner's decision was arbitrary and capricious, or without basis in the record. Since Malladi comes forward with no other indication of how the grievance examiner's report is infirm, which is her burden to bear, the court concludes that the report with respect to this grievance was appropriate and supported and is entitled to deference by this court. The challenge to this grievance is also without merit.

### 3. Permanent Reassignment

Malladi seeks review of the grievance report with respect to her permanent reassignment because, she alleges, the reassignment was disciplinary in nature, in contradiction to what the VA asserts, and that she was therefore deprived of the procedures afforded grievants when disciplinary actions are involved. This is the only basis on which she alleges the examiner's report is infirm.

To resolve this issue, the court looks to the VA's policies regarding employee grievances.[61] The policies define very clearly the types of actions that are covered by the procedures for disciplinary and major adverse actions. "Disciplinary actions" are defined as "adverse actions, other than major adverse actions, which include admonishment and reprimand based on conduct or performance."[62] Both "admonishment" and "reprimand" involve the issuance of an "official letter of censure" for different levels of offense.[63] "Major adverse actions" are defined as "suspension (including indefinite suspension) transfer, reduction in grade, reduction in basic pay, and discharge based on conduct or performance."[64] "Transfer" is further defined as "[t]he involuntary movement of an employee from one VA facility to another (under separate managerial authority)."[65]

From the VA's own policies, it does not appear that the action that Malladi challenges falls within the coverage of the procedures for disciplinary actions. Although it may be true that some of the reasons stated by the VA to support its decision to reassign Malladi may also form the basis for a disciplinary action, they have not led to such a disciplinary action here. Reassignment of employees is a power within the VA's prerogative. And so long as they have not taken any of the other actions that have the effect of being disciplinary, Malladi is not entitled to the procedures for disciplinary actions.

As for the reassignment, there is more than adequate evidence in the record to support the VA's decision to reassign Malladi. Although she may disagree with this decision, she certainly cannot argue that it was not a reasonable conclusion based on the evidence. This challenge is without merit.

## IV. CONCLUSION

For the foregoing reasons, the VA Secretary's motion for summary judgment will be

---

**60.** Plaintiff's reply brief in opposition to defendant's motion for summary judgment, filed August 18, 1997, at 17.

**61.** Defendant's exhibit GG.

**62.** *Id.* at 8–2. Although it is not clear whether the definition of "disciplinary actions" is meant to include only admonishment and reprimand, or is meant to include at least admonishment and reprimand, the discussion of specific procedures pertaining to "disciplinary actions" later in the policies suggests that it is meant to include only admonishment and reprimand. *See id.* at 8–10 to 8–14.

**63.** *Id.*

**64.** *Id.* at 8–3.

**65.** *Id.*

granted in full. An appropriate judgment will be entered.